## Lebanon Bank *versus* Mangan.

A certificate given by a bank as follows: "Mr. J. M. has deposited in this bank four hundred and forty dollars, *subject to his order, payable only* on the return of this certificate," is not negotiable; and will not entitle the holder to whom it was endorsed subsequent to the service of an attachment on the bank to claim the amount in preference to the attaching creditor.

The principle of the case of Patterson *v.* Poindexter, 6 *W. & S.* 227, affirmed.

The decisions of the Supreme Court of the United States, other than on the construction of the constitution or laws of the union, are not binding as authority on the courts of this state.

ERROR to the Common Pleas of *Lebanon county*.

This was an attachment execution at the suit of Patrick Mangan against Jacob Miller, John Elliott, and John Charters, with notice to the Lebanon Bank as garnishee. Mangan had a judgment against the defendants obtained on the 19th April, 1852, for $382.52.

On the 26th day of September, 1856, Jacob Miller, one of the defendants in the above-recited judgment, deposited in the Lebanon Bank the sum of $440, and received a certificate for it as follows:—

"$440.                    Lebanon Bank,
                    Lebanon, Pa., Sept. 26, 1856.

No. 91. Mr. Jacob Miller has deposited in this bank, four hundred and forty dolls. $\frac{no}{100}$, subject to his order, and payable only on the return of this certificate.

440 Dolls.                    EDW. A. UHLER, Cash."

The account of Jacob Miller on the books of the bank had an entry on the debit side, "Cert. No. 91," and on the credit side, "1856, Sept. 26, By cash, $440," and in this way it stood on the 30th day of September, 1856, the day the attachment issued, and was served on the president and cashier of the bank.

After the return of service, the plaintiff filed interrogatories, and a rule was granted upon the president and cashier of the bank. Their answers admitted the deposit made as above, and the indebt-

edness of the bank to Miller. The answers further showed that three or four days after the service of the attachment, Miller called at the bank, having the certificate of deposit in his possession. The cashier said, "Miller came into the bank, and he showed the certificate during the conversation. I did not explicitly notify him that the money was attached, because I inferred from his conversation that he knew it. He said Mr. Joseph Gleim had said he might thank me for the attachment, but he said he did not believe it. He lamented bitterly in consequence of his difficulty, and appealed strongly to me to do what I could to secure him the money for which he held the certificate, averring at the time that it was his wife's money. He said he had conferred with Mr. Kline. I then advised him to consult with and employ Mr. Kline to save the money if possible. I believe he said he would, and that he would be willing to take half the amount of the certificate. This was the substance of our conversation. I cannot recollect the precise words."

Subsequently, Miller sold and delivered the certificate of deposit to Drexel & Co., of Philadelphia, without the knowledge or privity of any of the bank officers. The holders sent the certificate to George Gleim, Esq., cashier of the Lebanon Valley Bank, for collection, who, on the 7th of October, 1856, presented it at the counter of the Lebanon Bank and demanded payment. The cashier declined paying it then, and stated to Gleim that a writ of attachment was served on the bank, and that it could not be paid until that was removed. It was again presented on the same day, but the cashier again refused to pay it, but after some debate on the consequences involved in a refusal to pay it, the matter was held over until the next day, when the cashier of the Lebanon Bank, upon consultation with other officers of the bank, paid it to the cashier of the Lebanon Valley Bank, and he surrendered to the Lebanon Bank the certificate of deposit.

For the garnishee it was contended that the certificate of deposit was *negotiable*, and having been actually negotiated in the usual course of business, after the attachment issued, the holder would be entitled to the amount, and that the payment of it to him by the bank was a discharge of the indebtedness.

The court below (PEARSON, P. J.) delivered the following opinion:—

"The record in this case shows that a judgment was recovered against the defendants, above-named, and an attachment in execution, with clause of *scire facias* against the Lebanon Bank, as garnishee, issued thereon, which was served on the 30th September, 1856, on the president and cashier. The answers of those officers to the interrogatories filed, show that a sum of money was deposited by Miller in the Lebanon Bank, on the 26th day of September, 1856, and a certificate issued in these words:—

[Lebanon Bank *v.* Mangan.]

'$440.            Lebanon Bank, Lebanon, Pa., Sept. 26, 1856.

Mr. Jacob Miller has deposited in this bank $440, subject to his order, payable only on the return of this certificate.

Signed, EDWARD A. UHLER, Cashier.'

"On the 7th day of October, 1856, the certificate was presented by George Gleim and payment demanded, and made on the next day. Prior to this, to wit, three or four days after the service of the attachment, Mr. Miller was informed thereof, and he then had the certificate in his hands, which he exhibited to the ·officer of the bank; subsequently it appears to have been transferred to Drexel & Co., and by them to George Gleim, cashier. The answers of the bank officers show that the money was in bank when the attachment was served; the certificate was in the hands of Miller at the time; he informed the cashier of his desire to avoid the effects of the writ, and to do so, subsequently endorsed it over to Drexel & Co.—it is to be presumed for value, in the absence of evidence to the contrary—and the bank officers afterwards, with full knowledge of the facts, paid the amount of the certificate to Mr. Gleim, to whom they communicated the circumstances, but feared to refuse payment lest the bank charter might be forfeited. There is nothing more clear than that their fears on that subject were groundless; as the money was seized by the law, they had a right to retain it until the rights of the respective parties were settled.

"We must now decide as to whether this payment was legal or otherwise? If unlawful, the garnishee must pay it to the attaching creditor.

"It has been suggested that judgment cannot be entered on motion, but must be on proper pleadings, or on an issue of fact; and for this, 2 *Miles* 243, has been cited. We do not think the principle of that case sound. When answers are filed stating the facts as the plaintiff concedes them, or admitting money to be in the hands of the garnishee, the plaintiff can move the court for judgment on the answers for the sum conceded by the garnishee to be in his hands; or where, as here, all the facts are stated, but a legal objection interposed, the court can decide on the admitted case as readily as though it had been set forth in a special plea. We shall therefore give our opinion on the facts conceded by the garnishee and the plaintiff in the attachment.

"If the writing given by the bank is a negotiable promissory note, and was actually negotiated in the usual course of business, the attachment, although executed before the transfer of the paper, will not avail against a *bona fide* holder, as settled in Kieffer *v.* Ehler, 6 *Harris* 388, reiterating the principle of Fulweiler *v.* Hughes, 5 *Harris* 440.

"If the paper is not a negotiable promissory note, the transferee

takes it subject to all the legal claims against the debt, and equities against the payer, that it was subject to whilst in his hands. There can be no pretence that this instrument is a bill of exchange, and therefore does not come within the common law or customary provisions as to such paper. Is it a promissory note within the stat. 34 Anne cap. 9 ?

"No particular form of words is. necessary to constitute a promissory note provided it be an *absolute* promise to pay a particular person or order, or to the bearer, a certain sum of money at all events : *Story on Promissory Notes*, § 12 ; *Bayley on Bills*, ch. 1, § 1 ; 2 *Mees. & Wels.* 74. But it must be an *express* promise to pay money, not merely an implied one by law, founded upon an acknowledgment of indebtedness : *Story*, § 14 ; 4 *Bing. N. C.* 433. An I. O. U., held to be a due bill, and not a promissory note within the statute. The promise must be express and not merely inferential : 6 *Scott* 267 ; *Story on Promissory Notes*, § 22. In Fisher *v.* Veslie, 1 *Esp. Rep.* 456, it was held that a slip of paper containing the words 'I. O. U. eight guineas,' is not a promissory note, but a mere acknowledgment of indebtedness.

"It is, however, useless for us to examine the English authorities on this subject, as we have a decision of our own Supreme Court, binding on us, which settles the very point under consideration. In Patterson *v.* Poindexter, 6 *W. & S.* 227, Chief Justice Gibson delivers a carefully considered and elaborate opinion, on a certificate of deposit not distinguishable in form or substance from that issued by the Lebanon Bank—except in some particulars to which we shall advert—and declares that it is not a promissory note within the statute of Anne, but a special agreement to pay the deposit on the return of the certificate. It may be transferred like other choses in action, and paid to the person who shall present the certificate, but an endorser in blank is not held on his naked endorsement, nor, as we suppose, could the endorser sue the bank in his own name. The instrument appears from the decision to have none of the incidents of a negotiable promissory note. The principles of the case are since recognised in Charnley *v.* Dulles, 8 *W. & S.* 361, per Sergeant, Justice, and in Gillespie *v.* Mather, 10 *Barr* 34, per Bell, Justice, and have never been shaken by any other judicial decision in this state. It is true that we have a contrary doctrine laid down by the Supreme Court of the United States in Miller *v.* Austin, 13 *Howard* 218 (not cited in the argument), where the question arose under a statute of the state of Ohio, very similar in terms to that of 3 & 4 Anne in force in Pennsylvania. Patterson *v.* Poindexter was referred to, and commented on, but was not considered a correct exposition of the law. The certificate was in terms the same as that in contest in Patterson *v.* Poindexter, and issued by the

[Lebanon Bank *v.* Mangan.]

same bank. In the courts where the decision in 13 *Howard* is to have the weight of authority, our Pennsylvania case, and those following in its wake, must be considered as overruled, but is nevertheless binding on us as an inferior court. The Supreme Court of the United States is not to declare the law for the state of Pennsylvania, except in those cases where their authority is made binding by the constitution and laws of the United States. On a question of general jurisprudence their decisions are entitled to no more weight than those of our sister states, and as that court is at present constituted, with me would have much less than those of Massachusetts or New York; for although the judges are more numerous, they certainly are not more noted for sound judgment, or legal acumen, but in both particulars fall greatly behind the superior courts of either of the states named, or of the Supreme Court of Pennsylvania. Taking the decision in Patterson *v.* Poindexter as binding on us, in what particular does it differ from that under consideration?

" The certificate of the Mississippi Union Bank *is* more in the form of a negotiable promissory note than that given by the Lebanon Bank. In the former a definite time is fixed for payment; it is made payable twelve months after date; it is made *payable* only to R. Patterson & Co., *or their order,* upon the return of the certificate. In the latter it is certified that Miller has deposited in this bank $440, *subject* to his order, *payable* only on the return of this certificate. No other time is given than the return of the certificate. It is due presently, if at all; but the money is left in the bank *subject* to the order of Miller. There is no promise to pay him except such as might be raised by *implication;* for the word '*payable,*' as here used, is not put in the form of a promise to pay to Miller or his order, but to pay on the return of the certificate—or rather it is a declaration that the money left by Miller is payable on the return of the certificate. This paper, in the early history of the law, would never have been considered a promissory note; I think would not now be so deemed in England, either under their stamp acts or the statutes of Anne, defining what shall be a negotiable promissory note; but would be considered a mere certificate of the deposit or bailment of a sum of money with the bank by Miller, subject to be drawn out by him, or on his order; but for the safety of the bank is only payable when the certificate is returned. It is in the nature of a special contract—is an obligation *sui generis*—and as a means of obtaining credit or raising money in distant places by the holder is of modern invention, differs most essentially from a bill of exchange, which was well known to the common law, and is not a promissory note within the statutes, consequently is not negotiable paper in the state of Pennsylvania. It follows as a corollary that Drexel & Co. and Mr. Gleim took it subject to the

[Lebanon Bank *v.* Mangan.]

legal claims against Miller, and that it was bound by the attachment issued and served by the plaintiff before its endorsement. The bank therefore paid it in its own wrong, and must account for it to the attaching creditor. The transfer of the paper, after Miller knew of the attachment, was a fraud on the law, and the payment by the bank with full knowledge by its officers of such fraud, was a violation of their duty. They should have suspended payment until the right was determined.

" The plaintiff in the execution was guilty of no negligence, and omitted no duty which the law imposed upon him, in endeavouring to secure his claim ; for although Mr. Justice LOWRIE does say in Kieffer *v.* Ehler, 6 *Harris* 391, that the court has the power to prevent the transfer of a negotiable instrument, after it has been attached, by requiring it to be placed in such custody as will prevent it from being misapplied, I confess myself at a loss to discover by what means this would be effected. The court has no power over the person of the defendant to oblige him to give over his promissory note to any one. In very many cases he cannot be served with the execution attachment, owing to his absence from the county ; and, if served, although his debt is attached, his person is free : *lis pendens* is not notice as there decided. It follows that if the paper is negotiable, and transferred to a *bona fide* holder after attachment and notice thereof on the defendant in the judgment, such holder will be entitled to collect the note. In the present case, the debt attached not being evidenced by a negotiable promissory note or bill of exchange, we must give judgment in favour of the attaching creditor and against the Lebanon Bank for the amount admitted to be due to the defendants by the answers to the interrogatories.

" April 25, 1857. The court enters judgment in favour of the plaintiff, the attaching creditor, for the sum of $446.54."

Thereupon the Lebanon Bank sued out this writ, and assigned for error,

That the court below erred in entering judgment against the garnishee on the facts disclosed by the answers to the interrogatories, and in deciding that the certificate of deposit was not negotiable.

The case was submitted on the paper-book by

*Weidman* and *Ulrich*, for plaintiff in error.

*Kline* and *Funk*, contrà.

The opinion of the court was delivered by

LEWIS, C. J.—On the 26th September, 1856, the Lebanon

[Lebanon Bank *v.* Mangan.]

Bank gave to Jacob Miller a certificate that he "has deposited $440, subject to his order on the return of this certificate." This money was attached by Mangan, a creditor of Miller. After the attachment, and after Miller had notice of it, he endorsed the certificate over to Drexel & Co. This endorsement was evidently made for the purpose of defrauding the creditor, and in contempt of the law and its process. Whether Drexel & Co. had notice of the facts, or what they paid for the certificate, if anything, does not appear by any evidence except the endorsement. The bank, with full notice that the endorsement was made after the money was attached in their hands, paid it to the agent of Drexel & Co. The court below was of opinion that this payment was no defence against the plaintiff in the attachment. The case turned on the question whether such a certificate of deposit was a negotiable instrument. The negative of this question has been three times decided by the Supreme Court of Pennsylvania: Patterson *v.* Poindexter, 6 *W. & S.* 227; Charnley *v.* Dulles, 8 *W. & S.* 361; Boker *v.* Hazard, 6 *W. & S.* 228. It was not pretended by any one that the instrument was a bill of exchange. It was contended that it was a promissory note. But the decisions proceeded on the principle that a promissory note could not exist without an *express* and *unconditional* promise to pay. The certificate of deposit was destitute of both these requisites. The money was merely stated to be "*subject* to the order" of Miller. The promise to pay was, therefore, only an implied one, arising from the facts set forth in the certificate. It was subject to the order of Miller only on "the return of the certificate." An unconditional draft, without returning the certificate, would not have entitled the payee to the money, according to the terms of the instrument. It was, therefore, payable only on a condition. But it is not our purpose to vindicate the decisions of our predecessors on this subject. It is sufficient for us to know that the question has been finally settled by the only authority which can be regarded as conclusive in this state.

The decision of the Supreme Court of the United States in Miller *v.* Austin, 13 *How.* 218, is certainly entitled to very great respect, on account of the learning and ability of the judges who administer the law in that court. But this question does not arise upon the construction of the constitution or laws of the United States; the case before that court was a certificate of deposit issued by a bank in Mississippi, and endorsed in Ohio. The action was brought in the latter state, not upon the certificate, but upon the endorsement. Every endorsement is treated as a new and substantive contract, and is governed by the law of the place where the endorsement is made: Slocum *v.* Pomroy, 6 *Cranch* 221; *Story Confl. Laws* 314. The Federal tribunal had, therefore, no other duty to perform than to ascertain what was

the law of Ohio; and its decision is nothing more than the expression of its opinion that, under the law of Ohio, the endorser was liable. Conceding this to be a correct exposition of the law of Ohio, it furnishes no reason whatever for a change in the settled laws and usages of this state. If each state is constantly changing its rules of decision for the purpose of conforming to those of its sister states, it might happen that by the time we had accommodated ourselves to the law of Ohio, that state, influenced by the like comity, might have adopted our rule, and thus the law would be rendered uncertain in both states. But it is remarkable that a decision of the Supreme Court of Ohio, in exact conformity with the Pennsylvania decisions, was cited in the argument, and the learned judge who delivered the opinion of the Federal Court did not undertake to show that the citation was erroneous, or that the decision had been overruled by the proper tribunal of Ohio. It is, therefore, by no means certain that the case of Miller *v.* Austin is even a correct declaration of the law of Ohio. It is very certain, however, that it is no authority on this question, in opposition to the decisions of the Supreme Court of Pennsylvania.

The same remark may be made in relation to the decisions of other states on this question. When a principle of Pennsylvania law has been settled by the Supreme Court of the state, it is not to be changed in order to conform to the laws of other states.

Judgment affirmed.